THIS was an action of trespass for taking and carrying away a stock of goods and merchandise in the city of Wilmington, claimed by the plaintiff to be his property, and seized in execution and sold by the defendant, late sheriff of the county, as the property of James A. Sanders, the father of the plaintiff. The only question of law or fact involved in the trial of it was a question of alleged fraudulent sale with intent to defraud creditors, and, as both the evidence and the law in the case are so fully stated in the charge of the Chief Justice to the jury in it, I have not thought it necessary to present any synopsis of the evidence or of the argument in the report of it.
The Court,
GENTLEMEN OF THE JURY — It no doubt appears to you that the trial of this case has occupied a very unnecessary length of time; and perhaps it might have been disposed of by the counsel in a shorter period. But the reason why seven days have been already consumed is that the case is one of inquiry into transactions extending over several years and which are alleged by the defendant to be fraudulent — it being the experience of courts that cases of alleged fraud require greater time for their disposal than most others, because fraud usually consists of a variety of circumstances, many of them secret or occult, which can only be entirely revealed after long and tedious examination of witnesses. As one rarely enters upon a career of fraud with respect to creditors without endeavoring to forecast and provide against circumstances and occasions likely to expose his artifice, it is generally extremely difficult to obtain the necessary proof to sustain a proceeding to defeat it, and when obtained it is found, in the vast majority of cases, to consist of a multitude and variety of isolated facts requiring, necessarily, the production of many witnesses. *Page 464 
Notwithstanding the great consumption of time in this case, so far the question still remains the single one announced in the early part of the trial — whether or not the property in controversy in this case was, at the time of the seizure of it by the defendant, the property of James A. Sanders?
The action of the plaintiff is what is called an action of trespassvi et armis, and is divided into five counts, or separate statements of the injury done him by the defendant. The first
is what is called a count de bonis asportatis, that is for seizing and carrying away the plaintiff's store goods; the second
is for entering into and upon the plaintiff's storehouse and premises and expelling, putting out and amoving him therefrom and keeping him amoved therefrom from the 26th of January till the 25th of March, 1881, whereby he lost and was deprived of the use and benefit of his said storehouse; and also that on the 26th of January aforesaid, he seized, took and carried away other goods of the like quality, description and value aforesaid as those mentioned in the first count aforesaid and converted the same to his own use, by means whereof the plaintiff was during all the time aforesaid not only deprived of the use and benefit of the storehouse, but also was during that time prevented from carrying on his business therein; the third is similar in substance to the second, varying slightly in language; the fourth is like the first in description of goods, omitting the clause "other wrongs," etc.; and the fifth is a short count for trespass to goods without describing them, with the allegation of "other Wrongs." At the close is the usual allegation of damage, which is laid generally at twenty thousand dollars.
To this declaration the defendant pleads: first, not guilty of the several trespasses alleged, upon which issue is tendered in due form by him and accepted by the plaintiff; second, a special plea of justification that the goods seized were not the goods of the plaintiff, but were the property of James A. Sanders, as whose he levied upon and sold them by virtue of four several writs of execution issued out of this court, being Nos. 73, 74, 75 and 76, to the May Term, 1881, at the suit of the several plaintiffs whose names are set forth in the plea; and third, another *Page 465 
plea of not guilty to the several trespasses alleged in the declaration; and also a plea of justification generally by virtue of execution process not set forth therein. There is another and fourth
plea, but it was demurred to by the plaintiff, and the demurrer having been sustained by the court, it became a nullity and need not be further noticed. There is the common entry of replications and issues upon the record, and issue is treated as being joined between the parties upon the matter of justification. I have stated the pleadings according to their substance merely as I understand them.
The prayers for instruction to you upon the law of the case, submitted on both sides, make it necessary that we should charge you in that respect; otherwise there would seem to be but little necessity of doing more than explaining the issues to you, and the law with respect to the measure of damages to be awarded the plaintiff Henry L. Sanders, if you should believe him entitled to any. Concerning the facts, no details of examination will be entered upon, for the reason that they are in themselves not at all obscure, or doubtful; though what they may mean, is of the very essence of this case. It is your province and not ours to decide with respect to their significance; it is ours to tell you the law to which you must apply them.
The leading facts proved in the case are — that James A. Sanders was in business as a dry goods merchant in this city prior to the year 1876, and then was, according to his letters to his brother Robert T. Sanders, of St. Louis, in need of money to meet the exigencies of his business. This brother did not accommodate him himself; but the advances to him came, as is stated by him in his testimony, from his wife Mary L. Sanders, with the exception of a small part, being his own funds. The whole alleged advances amounted to the aggregate of eight thousand dollars, part being remitted to him in one form, other parts and the residue in other forms (the precise times of the several alleged advances not being material), and all for relief to him in his business as a dry goods merchant. For those alleged advances, two several judgment bonds were taken in the name of Mary E. Sanders, one for the real debt of five thousand dollars *Page 466 
and the other for like real debt of three thousand dollars, the first being dated, and bearing interest from the 10th day of June, 1876 and the other the 24th day of August, 1877, and payable respectively on demand. These bonds were deposited with one of the counsel for the plaintiff in this action to be proceeded on, at his discretion, when necessary to the security of his client's interest. They were formally entered and made judgments of this court on the 4th of February, 1879. At the May Tenia, 1879 of this court, and on the 30th of that month, Messrs. Langfield, Litchten Co. and Messrs. William Lynch 
Co., merchants of Philadelphia, recovered judgments in suits severally against James A. Sanders, the first firm for two thousand seven hundred and thirty-eight dollars and ninety-one cents, and the other for one thousand two hundred and twenty dollars and forty-three cents; and at the following November Term, and on the 24th day of that month Messrs. Keyser Brown and Henry Albertson Bro., merchants also of Philadelphia, recovered judgments in suits severally against him, the first for seven hundred and seventy-three dollars and forty-six cents and the other for one thousand two hundred and thirty-eight dollars and fifty-six cents. Executions were issued upon Mary E. Sanders' judgments the same day they were entered, viz., on the 4th of February, 1879, and levied upon James A. Sanders' property, which consisted of the goods in his store (then at the northeast corner of Seventh and Market), but the store was left open for the sale of goods, with Janes A. Sanders in entire charge of it and making sales, until the 16th of the following month of May when the remaining stock was sold in bulk by the sheriff to Mary E. Sanders for the sum of one thousand nine hundred dollars. It is alleged by James A. Sanders in his testimony that he sold in the interval between the sheriff's levy and the day of sale — a period of a little over three months, goods to the amount of three thousand four hundred dollars, and that he paid over that sum to Mrs. Sanders' attorney aforesaid. The sale took place on a Friday; but the store was opened the next day (Saturday) as proved by Miss Hickey, Miss McMakin and young Ellinger who were clerks there, and the business went on as usual. Ten days afterwards, *Page 467 
viz., on the 26th of May, 1879, Elizabeth Bertha Sanders, a daughter of James A. Sanders, and who was chief clerk, or saleswoman, in her father's store, executed and delivered her judgment for the real debt of eight thousand dollars in favor of Mary E. Sanders, and received at the same time a bill of sale from her for the goods bought by her at the sheriff's sale and for which she, Mary E. Sanders, had taken a bill of sale from John Pyle, Esq., the sheriff selling the goods. This, supposing the prior transactions recited to have been bona fide,
operated a transfer of the title of the store goods to E. Bertha Sanders, who remained so far as writings could make her so, the owner until the 12th of August, 1880, when a like operation occurred between her and her brother, the plaintiff in this action — Bertha being about to marry and her aunt, Mary E. Sanders, insisting as is testified by James A. Sanders, that for that reason the sale should be made. The plaintiff's bond to Mary E. Sanders is dated on the said 12th of August, 1880. I do not remember that any formal transfer by bill of sale was made in the case of this latter alleged sale. On the 26th of January, 1881, the four several plaintiffs in the suits before mentioned — that is the Philadelphia creditors — caused executions to be issued upon the judgments recovered as aforesaid by them on the 30th of May, 1879, and ordered the sheriff to whom they were directed, Philip R. Clark, Esq., to seize and take into his possession the goods in the store at the corner of Seventh and Market as the goods of James A. Sanders, and to lock up the store itself. The sheriff obeyed his orders and when the appraisement was completed locked up the store and took the keys into his possession. In due time the goods were sold by the sheriff and brought forty-five hundred dollars or thereabouts, the precise sum I did not obtain. The appraisement was something over six thousand dollars. This levy closure and sale were treated by the plaintiff as being an invasion of his right, as indeed they were if he was thebona fide owner of the goods seized and the tenant of the store locked up; and to recover compensation for this wrong, he brought the action you are now trying. The sheriff is resisting that action, and it has been shown that he was indemnified by his execution plaintiffs before he took any steps under the *Page 468 
writs, and also that he was notified by the plaintiff in this action not to meddle or interfere with the goods, at his peril, the goods being claimed as the goods of the plaintiff and the ownership of them by the defendant in his writs, James A. Sanders, denied. The sheriff acted therefore with his eyes open to the peril threatened, and if you think him not justified in his course by the facts of the case as developed in the testimony of the witnesses, he must abide the consequences of his act.
There is no lack of testimony, so far as those of the plaintiff's witnesses who claim to be cognizant of the facts are concerned, that the transactions which occurred between James A. Sanders, Mary E. Sanders, E. Bertha Sanders and the plaintiff, Henry L. Sanders, were fair, honest, bona fide acts in all respects. Certainly they apparently are unsuspicious (though somewhat singular) considered in the light of that testimony alone. If you give credit to that testimony of the good faith of these several acts between the parties, there would seem to be no defence for Sheriff Clark. But the fact will not be overlooked that all those witnesses are the actors in those transactions, and one of them, the plaintiff in this action, is testifying in his own interest, and but for the act passed at the last session, making parties competent witnesses, could not have been offered as a witness in this case. The same is true also about certain of the witnesses on the other side who are plaintiffs in the suits on which the executions were issued to Sheriff Clark, and with respect to his acts under which he was indemnified by them.
But the defendant alleges that although much formality of transaction was observed in these dealings with respect to the goods sold to Mary E. Sanders by Sheriff Pyle, yet that in point of fact the whole of them were fraudulent and void as being in violation of the law of this State and in derogation of the rights of his creditor plaintiffs. Much testimony has been offered in support of this contention by way of proof of circumstances inconsistent with the plaintiff's claim of good faith. And here 1 think it proper to say to you that very rarely can fraud be established like other facts — the proof of its existence consisting, in almost all cases, of circumstances which, separately, would *Page 469 
not prove much, but taken together form a chain of proof sufficiently complete to compel a jury to treat transactions apparently fair as entirely covinous and fraudulent. Another difficulty consists in the fact that in most cases it takes two to concoct a fraud, and therefore there are two co-operating or conspiring minds to contrive the evil and conceal the artifices by which they acted, or so color them with an appearance of honesty as sometimes to deceive the most wary. I shall speak of some of those artifices presently.
The circumstances understood to be relied upon by the defendant in support of his contention of fraud are the following: The fact that it has not been shown that Mary E. Sanders was able to make advancements to James A. Sanders, such as have been shown in this case; that the testimony of the plaintiff shows that she was a mere needle-woman at the time of her marriage, earning her living that way, though she had others in her employ. From this they ask you to draw the conclusion that whatever was advanced by her to him was, in fact, his own money realized in the course of his business. While it is true that proof of circumstances on the part of Mary E. Sanders sufficiently affluent to enable her to lend money to her brother-in-law has not been made, at the same time it has not been shown how James A. Sanders could have realized at the times when the several sums, amounting together to eight thousand dollars, were advanced enough by his business to enable him to place the several amounts within her control. If no proof had been made about the employment of Mary E. Sanders, or other fact with respect to her circumstances, nothing could have been said about her inability to advance, as it is alleged she did, these considerable sums of money to her husband's brother; but proof of her occupation was made, and no other given to show how she could have so much capital at her disposal. Another circumstance relied upon is, that notwithstanding the sale of Sheriff Pyle took place on a certain day — Friday — yet the very next day — Saturday — the store was opened and everything went on as usual — selling, buying, dealing, transacting — and all by-James A. Sanders; and he thinks he has shown to you, by the *Page 470 
testimony of those who were so situated as to know, that this state of things continued up to the time of the seizure of Sheriff Clarke, notwithstanding the evidences of a sale on credit to E. Bertha Sanders on the 26th of May, 1879, and the subsequent pale in August, 1880, to Henry L. Sanders, the plaintiff; those witnesses, in fact, testify that they saw no change whatever in the management or business of the store, and were without knowledge of any change of ownership except such as appeared by change of letters upon the awning and in the bill-heads and the imprint upon the store wrappers. All seemed to go on precisely as before, and if you believe those witnesses it must have been so, for Bertha was but the head clerk at the time of the alleged sale to her, and she is not shown to have taken any other position in the store afterwards. All the chief management of the business at Seventh and Market was in the hands of James A. Sanders, who was the chief and almost the only purchaser of the goods and paid all the bills. It is answered to this, by the testimony of James A. Sanders, that he was the agent of his daughter Bertha, and had such general management in her behalf and stead, and that he was also the agent of his son by virtue of a letter of attorney, which is produced in evidence. Still another circumstance which is relied upon by the defendant is the fact that during the whole time of the alleged ownership of the plaintiff, as shown by the proof, he was not resident in this State and had not the least actual control of the business; in fact, that he was then a mere clerk in New York, and neither he nor his sister had any money or property at the time of these alleged sales. These are the chief circumstances relied upon by the defendant, though he has adduced others in proof not necessary for me to consider.
To all these circumstances showing, unexplained, obvious ownership on the part of James A. Sanders, the plaintiff replied that all his conduct and acts were in entire harmony and accord with the agency for his daughter and son. And so, in fact, they were upon the theory of the honesty of the transactions. Whether they were, in fact, honest is the very matter you are trying; and the defendant, upon this contention of the plaintiff, shows you by *Page 471 
the proof of James A. Sanders himself that he rendered no accounts of his agency to his principals, who seem not to have been desirous to have any. It must be remembered, however, that they were parent and children. The only evidence we have of any employment of James A. Sanders with compensation is the statement by his son in his testimony that the understanding between them was that the family of his father, consisting of six persons, were to be maintained and the rent of his house paid out of the profits of the store. I have now said all that I think proper about the testimony, and will ask your attention to the law which you are to apply to it. I will state the law generally in relation to fraudulent sales, which will be general answer for both sides, and will then, for the satisfaction of plaintiff's counsel, take up his points in detail and state our opinion upon them.
It is necessary to the validity of sales of personal property that the goods sold shall be delivered by the seller into the hands of the buyer as soon as conveniently may be. Such a sale is presumably an honest one, and cannot be impeached except by proof of fraud between the parties; if that be shown, then it is a dishonest one. By the law of this State, a sale without delivery is void as to creditors, but good as between the parties themselves, who would not be allowed in a court of justice to avoid their own fraudulent sale. A convenient means resorted to before the law became fixed, was a bill of sale to make transfer of title; and under this device gross frauds were practiced. Our act of assembly following the British statute of frauds provides in effect that no sale or bill of sale shall be valid (except as between the parties to it) to transfer the title to personal property unless the thing sold shall be actually delivered into the hands of the buyer as soon as conveniently may be; and that if the property shall afterwards come into and continue in the hands of the seller, it shall be liable to the debts of all his creditors. This latter provision was enacted because of the trick of delivery practiced by the parties to fraudulent sales to comply with the law of honest sales. Another device was resorted to (so fertile of expedients is the ingenuity of fraudulent persons) to defraud creditors. This was *Page 472 
by the means of a judgment and execution, whereby a certain serious formality was given to an act of collusion and guile; and the goods of the covinous debtor were seized and held under the lien thus acquired, but for the debtor's benefit. This device was only another form of a fraudulent bill of sale and of no more value; for the retention of the property levied on by the debtor was treated by the law as fraudulent and void, and the same property was liable to be seized and sold on another execution. In a case of this kind, the latter sale was held to be valid, the jury having found that the first execution was fraudulent and void. 1 Wils., 44; Roberts on Fraud. Con., 572. And under the law as administered in England, any leaving of the goods purchased by a creditor at a sale by him of his debtor's property, in the custody of such debtor beyond a reasonable time, was evidence of fraud in the execution under which they were sold. In this State, while the severity of the law against fraud vitiates sales without delivery consistent with them, and while the law of England, from which our jurisprudence is derived, views a levy of goods as fraudulent unless the sheriff take them away or keep them on the premises openly in charge of a bailiff or deputy, yet it has been so long our practice to leave goods levied on in the possession of the execution debtor, that no intendment or conclusion of fraud can be made of such usage. It may be called a part of our common law. Therefore, unless there be something more than the bare fact that goods seized are not taken out of a debtor's custody, but left in it, the levy will not be held to be invalid on any ground of fraud. In this case, therefore, the fact alone that the goods of James A. Sanders were, when levied upon, left by the orders of his execution credito, Mary E. Sanders, in his custody, would not justify you in inferring fraud; but other circumstances would have to concur for that purpose. But where the rights of other creditors are involved, to allow an execution debtor to act and deal with such property, levied on, as his own unqualified property, as by selling and disposing of it for his own use, would be a strong circumstance to show collusion between the parties, and the apparent indebtedness a feigned and covinous one. And if the jury should *Page 473 
believe from the evidence and circumstances showing such a state of conduct on the debtor's part that the execution was really intended as a cover to shield the defendant's property from his creditors though pushed to a sale, and that parties who afterwards became the owners of that property accepted their title with knowledge of the true state of things, or with such evidence before their eyes as would naturally create suspicion, their title would be effected by the same fraud, although such title might have come to them through the creditor who caused the sale to be made, he being the pruchaser; for the fraud would only be the more odious that the process of the law had been abused to promote it. If, therefore, in this case, you should believe from the facts and circumstances proved in evidence, that the judgment bonds given by James A. Sanders were fraudulent (and in making up your opinion subsequent facts are equally evidence with prior ones, if you find any of the latter), then the sale under the executions issued upon them were invalid and passed no title as against creditors, to the property held by James A. Sanders; and the subsequent transfers to Bertha and Henry L. Sanders, respectively, were invalid and fraudulent also if, in your opinion, they knew of the bad faith or collusive fraud between James A. Sanders and Mary E. Sanders. In such case your verdict should be for the defendant. If, on the contrary, you are of opinion that the defendant has not shown sufficient facts to warrant you in believing that James E. Sanders and Mary E. Sanders intended a fraud by the transaction of the judgment bonds, and that James A. Sanders, after the sale of his property, was not allowed by her to use and did not, in fact, use and deal with it as his own in such manner as was inconsistent with title in her, then your verdict should be for the plaintiff.
A bill of sale is not necessary to pass the title to personal property; but delivery is. Nor is a power of attorney necessary to make one an agent, though it is common to employ for that purpose such an instrument. Although remaining in possession of goods sold by the sheriff on the party himself, is as the. law in England is, fraudulent, yet it is not invalid if the real owner has in his own behalf and for his own benefit entrusted the former *Page 474 
owner with an agency of them. Nor since the case of Perry v.
Foster in this court (3 Harr., 293) is it any sign of fraud for one who buys a debtor's property at sheriff's sale to leave it with him from motives of humanity, or any other honest purpose. In that case it was a horse and the debtor a tenant merely; and it was but pure kindness on the part of a mere purchaser of the horse to give him thus the means of support. But no other case upon that point has been decided; and it is not likely that the decision will be extended so as to embrace cases not equally free from suspicion. To allow an execution debtor to retain his property sold and deal with it as his own, would hardly stand on any better footing than a sale by bill of sale unaccompanied by delivery. In principle there would seem to be no difference. In Twyne's case, reported by Lord Coke and by Moore as Chamberlain v. Twyne, there was a bill of sale but no delivery, and the vendor or owner continuing in possession and using the goods as his own, the transaction was held to be fraudulent. This was the first case after the passage of the statute 13 Eliz., of fraudulent sales, and upon it have been founded most of the decisions since made. And in view of the law as administered since that time, we may say to you that if a creditor should buy his debtor's property at a sale made by virtue of his own writ and leave it in the debtor's custody, who should afterwards deal with it as his own, as formerly by selling or otherwise disposing of them, the transaction would be held to be fraudulent, and the property liable to the defendant's execution creditors. For the legal proceedings would not impart to the transaction an honest character, nor remove from it the stain that discolors fraudulent acts. A fraud is none the less a fraud, because it is advanced by means of legal process.
Fraud is however never to be presumed merely, but is to be proved. The meaning of this is — that the transactions of men apparently honest are presumed to be so in fact; and a party alleging the contrary must make good his averment by proof. The burden is on him to do that. When his evidence is sufficient to remove that presumption, in other words to cast suspicion upon the transaction, it devolves then on the party asserting *Page 475 
the honesty of the transaction to remove that suspicion. While fraud is not to be presumed merely — that is imagined or conjectured or suspected — yet it may be proved by circumstances only, provided they are strong enough for the jury, it being in most cases impossible to prove it in any other way. LeaVing goods purchased by bill of sale, oral contract, or execution process in the hands of the former owner who deals with and uses them as his own, is fraudulent and void. As was said by the court in Perry v. Foster "in cases of sale without change of possession, if nothing more appears, it is void." The reason is twofold — that it induces a false credit and is calculated to deceive creditors and purchasers, and that it is inconsistent with the purpose of a sale of goods, which is on one side to get the goods, and on the other the money.
Nields and Spruance for plaintiff.
Hoffecker and Lore for defendant.